Jean Burnham Peck v. Commissioner. Arthur Peck v. Commissioner.
Peck v. Commissioner
Docket Nos. 10207 and 10208.
United States Tax Court
1947 Tax Ct. Memo LEXIS 88; 6 T.C.M. (CCH) 1035; T.C.M. (RIA) 47256; September 25, 1947
*88 James J. Dougherty, Esq., for the petitioners. Karl W. Windhorst, Esq., for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined deficiencies in income tax for 1941 as follows: Docket No.
10207
Jean Burnham Peck
$1,017.40
10208
Arthur Peck
520.28 The deficiencies resulted from the disallowance of long-term capital losses claimed from the sale in 1941 of preferred stock of Osmo Garden Company. The facts have been submitted by stipulations and joint exhibits consisting of returns filed by Osmo and the petitioners. [The Facts] The petitioners are husband and wife. They filed their separate returns for 1941 with the collector of internal revenue for the first district of Pennsylvania. The Osmo Garden Company (herein called Osmo) was incorporated late in 1936. It issued 330 shares of preferred stock for cash at $100 per share and 6,000 shares of $1.00 par common to Henry C. Avery for property. It acquired, for cash and common stock, a going business from Avery. The business included equipment, dies, materials, and accounts, and 5 patents for the manufacture of horticultural products. Osmo valued the *89 patents at $6,000 and the other property at $8,250. Osmo operated at a loss at all times material hereto. It ceased manufacturing on or about April 30, 1938. Osmo entered into an agreement with American Fibre-Velope Manufacturing Company (hereafter called American) on January 4, 1939. American desired to engage in the manufacture of products formerly manufactured by Osmo and to procure a license from Osmo to use its trademarks, patents, and certain property. Osmo then owed American $687.56. Osmo appointed American its sole agent to manufacture Osmo products for five years with renewal privileges. Osmo sold its inventory of raw materials, goods in process and finished products of a value of $2,500 to American to be paid for by American crediting Osmo with the cost as American sold the finished products made therefrom. Net profits were to be divided, after the first $5,000 to American, 25 per cent of next $5,000 to Osmo, 50 per cent of next $10,000 to Osmo, and thereafter 75 per cent to Osmo. Osmo never received any payment under the agreement with American. The balance sheets of Osmo for a period beginning in 1940 and ending in 1941 show assets of about $10,800, including patents *90 valued at $7,354.39, and no liabilities. Jean Burnham Peck purchased 150 shares of Osmo perferred stock for $15,000, 145 shares in 1937 and 5 in February 1938. Arthur Peck purchased 50 shares of Osmo preferred in 1937. The preferred stockholders sold their 330 shares in December 1941 to Avery, the owner of the common stock, for $.20 per share. Jean Burnham Peck paid transfer tax of $10.50 on the sale of her 150 shares and claimed a long-term capital loss on her return for 1941. Arthur Peck paid transfer tax of $3.50 on the sale of his fifty shares and claimed a long-term capital loss on his return for 1941. [Opinion] The Commissioner denied the deductions and further determined that the amounts received were profits. He claims that the stock became worthless in a prior year but he does not say just when. There is no suggestion that the petitioners ever claimed losses in a prior year on the theory that the stock was worthless. There is no suggestion that the sale to Avery lacked bona fides. The parties have not given the Court much information but such evidence as has been introduced supports the petitioners' contention that the stock never became completely worthless, *91 but had some value at the end of 1940. The corporation had no debts in 1940 and it had some assets. If any of the assets were worth anything, that value would be reflected in the preferred stock. The respondent introduced in evidence a return of Osmo as a joint exhibit. No purpose was stated for the introduction of the exhibit. It shows that the patents were valued at $7,354.39 in 1940 and 1941, the corporation had a small amount of cash, and machinery, equipment, furniture and fixtures worth $1,089.24 after deducting a depreciation reserve of $358.36. The respondent is in no position to argue that his own exhibit is misleading and unreliable. He suggests in his brief that Avery, the owner of the common, bought all of the preferred stock so that, as the sole stockholder, he would own the patents "for what they might be worth", thus conceding that they might still have value. The evidence, such as it is, preponderates slightly in favor of the petitioners. The stock was not worthless prior to 1941. Decision of no deficiencies will be entered.